```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3    PRINCETON DIGITAL IMAGE CORPORATION,     : CIVIL ACTION
                                               :
 4                    Plaintiff,               :
       v                                       :
 5                                             :
      ALTICOR GLOBAL HOLDINGS, INC., QUIXTAR.COM, :
 6    INC., ALTICOR, INC., and AMWAY CORP.,    :
                                               :
 7                    Defendants.              : NO. 13-512-LPS
      -------------------------------------------
 8    PRINCETON DIGITAL IMAGE CORPORATION,     : CIVIL ACTION
                                               :
 9                    Plaintiff,               :
       v                                       :
10                                             :
      FTD GROUP, INC., and UNITED ONLINE, INC., :
11                                             :
                      Defendants.              : NO. 13-518-LPS
12                                   - - -

13                         Wilmington, Delaware
                          Monday, March 31, 2014
14                    Oral Argument Hearing - Motions

15                                   - - -

16    BEFORE:        HONORABLE LEONARD P. STARK, U.S.D.C.J.

17    APPEARANCES:              - - -

18
                 O'KELLY ERNST & BIELLI, LLC
19               BY: SAMUEL MOULTRIE, ESQ.

20                    and

21               O'KELLY ERNST & BIELLI, LLC
                 BY: MICHAEL K. BOTTS, ESQ.
22                    (Washington, District of Columbia)

23                    Counsel for Plaintiffs

24
                                Brian P. Gaffigan
25                              Registered Merit Reporter
```

```
 1    APPEARANCES:  (Continued)

 2
                   FOX ROTHSCHILD, LLP
 3                 BY:  GREGORY B. WILLIAMS, ESQ.

 4                       and

 5                 BRINKS HOFER GILSON & LIONE
                   BY:  LAURA BETH MILLER, ESQ.
 6                      (Chicago, Illinois)

 7                          Counsel for Defendants in
                            Civil Action 13cv512-LPS
 8

 9                 RICHARDS, LAYTON & FINGER, P.A.
                   BY:  KELLY E. FARNAN, ESQ.
10
                       and
11
                   FOLEY & LARDNER, LLP
12                 BY:  JEAN-PAUL CIARDULLO, ESQ.
                       (Los Angeles, California)
13
                            Counsel for Defendants in
14                          Civil Action 13cv518-LPS

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          - oOo -

 2                  P R O C E E D I N G S

 3               (REPORTER'S NOTE:  Oral argument hearing was

 4      held in open court, beginning at 9:32 a.m.)

 5               THE COURT:  Good morning, everyone.

 6               (The attorneys respond, "Good morning, Your

 7      Honor.")

 8               THE COURT:  Let me have you put your appearances

 9      on the record, please.

10               MR. MOULTRIE:  Good morning, Your Honor.

11               THE COURT:  Good morning.

12               MR. MOULTRIE:  Samuel Moultrie of O'Kelly Ernst

13      & Bielli on behalf of Princeton Digital Image Corporation;

14      and with me is Michael K. Botts out of our Washington, D.C.

15      office.

16               THE COURT:  Welcome.

17               MR. BOTTS:  (Nodding "hello.")

18               MS. FARNAN:  Good morning, Your Honor.  Kelly

19      Farnan from Richards Layton & Finger on behalf of the

20      defendant United Online.  And I have with me as co-counsel,

21      Jean-Paul Ciardullo from Foley & Lardner, and he will be

22      making the presentation today.

23               THE COURT:  Thank you.  Welcome.

24               MR. WILLIAMS:  Good morning, Your Honor.

25               THE COURT:  Good morning.
```

1          MR. WILLIAMS:  Greg Williams from Fox

2    Rothschild.  With me is my co-counsel, Laura Beth Miller

3    from Brinks Gilson in Chicago; and we're here on behalf of

4    the Alticor defendants.

5          THE COURT:  Okay.  Thank you very much.  Welcome

6    as well.

7          So we have really two cases here with multiple

8    motions.  Have you all talked about how you might like to

9    break up the time?

10          MR. WILLIAMS:  Yes, Your Honor.  We do have a

11    proposal.  We would like to start with the presentation of

12    the motion to transfer by the Alticor defendants, followed

13    by the argument on the motion for leave to amend claim,

14    followed by the motions of the other defendants.

15          THE COURT:  Okay.  That's agreeable to you,

16    Mr. Botts?

17          MR. BOTTS:  Yes, Your Honor.

18          THE COURT:  Agreeable to the other defendant?

19          MR. CIARDULLO:  Yes, Your Honor.

20          MS. FARNAN:  Yes, Your Honor.

21          THE COURT:  All right.  We'll do it that way.

22    Thank you.

23          Good morning.

24          MS. MILLER:  Good morning, Your Honor.  Laura

25    Beth Miller on behalf of the Alticor defendants, as

1    Mr. Williams has pointed out.

2           I'd like to address first our motion to transfer

3    which for purposes of the motion, I will assume all the

4    proposed defendants as well as the defendants that we have

5    agreed should be in the case are parties.  Obviously, if the

6    motion for leave to amend is denied, that would present even

7    a stronger case for transfer.

8           THE COURT:  All right.  So remind me, who is in

9    the case?  Who are you agreeing to be in the case, and who

10   is at issue in the later motion?

11          MS. MILLER:  Yes, Your Honor.  The party that

12   has answered so far is Alticor Inc.  Alticor Inc. is a

13   Michigan corporation with headquarters in Ada, Michigan

14   which is in the Western District of Michigan.

15          The proposed party Quixtar Inc. is a party that

16   has been identified in the motion to amend, and we do not

17   dispute that they would be a proper party.  Quixtar Inc. is

18   a Virginia corporation.  It's out now, actually been renamed

19   to Amway Corp.  It's headquarters is also Ada, Michigan.

20          The party that is the subject of the motion to

21   amend that is in dispute is Amway International Inc.  It's

22   primarily a holding company.  It is incorporated in Delaware.

23   But, again, its headquarters and operations are in Ada,

24   Michigan.

25          So for all of the defendants -- and I believe,

1    counsel, you would agree that is all the proposed defendants

2    at this point?

3                    MR. BOTTS:  I'm sorry?

4                    THE COURT:  Do you agree to that layout of the

5    parties at issue with respect to this motion?

6                    MR. BOTTS:  Yes, Your Honor.  I believe it is

7    stated correctly.

8                    THE COURT:  Thank you.

9                    MS. MILLER:  With respect to all proposed

10   and named defendants, they all are headquarters in Ada,

11   Michigan; and they have been for the entire portion of time

12   that is at issue here.

13                   I think what should be noted that is unique

14   about this case is that the patent at issue here expired in

15   December 2007.  So the operative facts at issue based on

16   the filing date of the complaint are the period of alleged

17   infringement between April 2007 and December 2007.  For that

18   entire period of time, and since, and even before, but for

19   the operative period of time, all of the defendants have

20   been headquartered in Ada, Michigan.

21                   During the operative period of time, plaintiff

22   did not exist.  Plaintiff did not acquire the patent until

23   after the patent expired.  Plaintiff incorporated in January

24   2010, two years after the patent expired.  It incorporated

25   in Texas.  Its website indicates that it is an acquisition

1    and licensing entity headquartered in Texas.  And in January

2    2010, it acquired this patent.  It then waited another three

3    years to file the lawsuit against the proposed named

4    defendants.

5            So for purposes of the motion to transfer, we

6    think it is particularly important to note that the plaintiff

7    itself is not incorporated here, it is not headquartered here,

8    and it is an entity that came into existence after the patent

9    expired in order to enforce patent rights that it believes it

10   has in the patent.  Obviously, it would expect or I think it's

11   reasonable for it to expect that it would have to do that on a

12   nationwide basis.

13           The operative facts in this case relate to --

14   and this is a nontechnical description of what we understand

15   the patent to be directed to -- encoding of images in a

16   particular JPEG format.  The accused and proposed website

17   that allegedly have these encoded images are websites that

18   were designed, developed, operated, maintained in Ada,

19   Michigan during the operative period of time.

20           Now, some of those websites no longer exist, some

21   have changed, as you can expect, in dramatic ways since 2007.

22   But during the entire period of time, they were maintained in

23   Michigan.

24           The final -- well, not the final but another

25   important factor on the motion to transfer is the list of

1    witnesses that we have been able to identify or potential

2    witnesses that we've been able to identify so far.  And

3    those are attached to Mr. Cole's declaration, Docket No.

4    23.  Those, witnesses again, there is a number of witnesses

5    that are located in Ada, Michigan, some of them current or

6    former employees of an Alticor defendant.  Some of them,

7    Michigan-based companies who consulted with Quixtar in

8    designing and developing the website in the mid 90s or late

9    90s.

10              THE COURT:  Is there any evidence that any of

11   them would be unwilling to come to Delaware for trial, if

12   necessary?

13              MS. MILLER:  We have not contacted them to know.

14   Being former employees, we wouldn't have control.  So I

15   can't say on the record whether or not they would come or

16   not.

17              In this case, there really has been no

18   identification of ties to this jurisdiction.  I know you are

19   well familiar with the *Intellectual Ventures* case.  We think

20   that case is particularly distinguishable from this case.

21   In that case, all of the defendants were incorporated in

22   Delaware.  Plaintiff was incorporated in Delaware.

23              Those are exactly the opposite facts we have here.

24   Plaintiff is not incorporated in Delaware, it's not doing

25   business in Delaware, and all but one of the defendants is

1    incorporated elsewhere, and all of the defendants are

2    operating elsewhere.

3            I think *Intellectual Ventures*, which is probably

4    the most significant case that plaintiff has cited, is also

5    different because in this case, there is not ongoing alleged

6    infringement.  This is activities that happened many years ago.

7    So the interest that this jurisdiction might have in an ongoing

8    dispute with ongoing activities is again distinguishable

9    from other cases where transfer may have been denied.

10           I think the cases that are much more akin to the

11   cases in our case are the *Linex Technologies* case where in

12   that case, even though plaintiff was a Delaware corporation,

13   the Court determined that it would be appropriate to transfer

14   because the plaintiff was not incorporated in Delaware, just

15   like our case here, and the infringement claims were based

16   elsewhere.  In that case, the Court recognized that

17   infringement claims have "even deeper roots in the forum

18   where the accused products were developed."

19           I think the *Linex* case sheds light on why this

20   case should be transferred to Michigan because like that

21   case, the accused activities are centered in Ada, Michigan.

22           The *Mekiki* case, *Mekiki* v *Facebook* -- and to the

23   extent I'm mispronouncing that, I apologize.  That is again

24   another case where the plaintiff's forum choice was given

25   less deference because the facts occurred outside of this

1    jurisdiction.

2              Plaintiff has said, notwithstanding the fact

3    that it is not incorporated here, that it is not doing

4    business here and that all of the defendants' activities

5    occurred elsewhere.  It said that, well, this Court should

6    keep it because there are other co-pending cases.  That is

7    true, there are other co-pending cases here.  However, there

8    are also co-pending cases in New York.  So this is not the

9    only jurisdiction that is addressing this patent.

10             THE COURT:  As I understand it, there was

11   something like 50-related cases filed here originally and

12   something on the order of 30 of them are still pending in

13   front of me.  Do you agree with that?  What is the status?

14   And how many are there in New York?

15             MS. MILLER:  To answer all of those questions, I

16   agree that count is probably pretty close.  A number have

17   settled.  From what we have looked at, there has been no

18   real substantive action on the cases here in Delaware.  The

19   parties seem to be settling or maybe have not got to the

20   point of substantive action yet.  I can't characterize all

21   of them.  New York, on the other hand, is a case where there

22   is substantive action still pending.

23             THE COURT:  Apparently, a Markman hearing was

24   scheduled.  Did it occur?

25             MS. MILLER:  I would let counsel address that

1   because he may have had more than one patent involved with

2   that Markman so I'm not quite sure.

3            THE COURT:  But from your perspective, you even

4   said in passing earlier plaintiff should have expected to

5   have to litigate this patent nationally.  What did you mean

6   by that?  And in that regard, how important is whatever is

7   going on in New York?

8            MS. MILLER:  So what I meant by that, Your

9   Honor, is the purpose of this plaintiff as opposed to the

10  plaintiff in maybe some of the other cases, this plaintiff

11  formed its existence after the patent was expired for the

12  sole purpose of litigating the patent, and yet it choose to

13  incorporate and make its headquarters outside of Delaware.

14           If Delaware were truly an important venue for it

15  and it wanted the Delaware presence, it could have chose to

16  incorporate here but it did not.  Instead, it has accused,

17  as the docket sheet shows, companies throughout the country

18  of infringement.  Prior to filing the lawsuit against our

19  client in filing in Delaware, it was already litigating

20  cases in New York.  Those cases in fact had been in Texas

21  and were transferred out to New York.

22           So the expectation of a licensing acquisition

23  company, unlike an operating company which is what the

24  Alticor defendants are, the expectation that they have to

25  address license and acquire those patents on a national

1    basis, it is reasonable to expect that it may have to

2    litigate those outside of one jurisdiction.

3              On the flip side, the Alticor defendants,

4    Quixtar and Alticor, both being operating entities, are

5    centered and based in Michigan.  They have been there over

6    50 years.  They have a huge manufacturing facility, and

7    they have a true local presence in the Grand Rapids area.

8              The *Semcon Technologies* case I think is

9    informative in this case because in that case as well there

10   were co-pending cases in this jurisdiction and yet the Court

11   said that factor, while it may weigh against transfer, was

12   not that strong of a factor because the infringing

13   activities occurred outside of Delaware.

14             Again, like the *Semcon* case, this case is

15   particular in the nature of the defendant in the fact that

16   the operative facts occurred in Michigan.  They occurred

17   some time ago.  So the reasonableness of keeping it here

18   is not as strong as transferring it to Michigan where the

19   Alticor defendants are based, where they intend to defend

20   against the action.  And the fact that the Delaware cases

21   here have not progressed that far, for whatever reasons

22   between the parties.

23             The other argument that plaintiff makes about

24   its reasonable and legitimate reasons for keeping the case

25   here was that it thought that Delaware was proximate and

1    convenient to the parties.

2              I think the facts would tend to show otherwise.

3    Obviously, the Western District of Michigan is the District

4    in which Ada, Michigan is located, so obviously that would

5    be much more practical and convenient for the defendants as

6    well as the other former employees and the business

7    consultants located in Michigan.  Likewise for plaintiff,

8    being a Texas company, being a Texas incorporated entity,

9    Delaware is not necessarily more convenient to it than

10   Michigan.

11             I don't think any of the parties dispute that

12   personal jurisdiction would be appropriate in either

13   jurisdiction.

14             The remainder of the factors are really public

15   interest factors, largely neutral.  But to the extent they

16   favor one side or the other, they favor Michigan in this

17   case, particularly given the fact that they are operating

18   entities the length of time from which the case is.

19             THE COURT:  What about the overall interest of

20   the federal judicial system?  You say there are related

21   cases in the Southern District of New York.  There certainly

22   will be plenty in front of me no matter what.  Should I

23   really be interested in burdening a third District Court

24   with this case?

25             MS. MILLER:  I think, Your Honor -- and I

1    realize I may stray beyond the facts of the brief, but to

2    get a sense of the understanding of the client I think you

3    should.  The case is directed to what defendants' activities

4    were, are being accused of, or what they engaged in in 2007

5    in the way they encoded these JPEG images.

6            The patent itself recognizes that the industry

7    standard was prior art and known.  Therefore, the plaintiff's

8    claims must necessarily be directed to the specific way our

9    clients encoded, and that is different from possibly other

10   defendants.

11           In addition, we have strong affirmative defenses

12   related to laches.  We also have other -- I'm trying to

13   think of the claim -- other affirmative defenses, I'm sorry,

14   that would be specific to our client that I think may or may

15   not apply to the other defendants.  Laches would be one.  We

16   also have license defenses.  I hesitate to get into the

17   details on that argument some because they may be confidential.

18   But needless to say, they are defendant specific affirmative

19   defenses.

20           So I think it's reasonable to bring the case to

21   the jurisdiction where the courts are very familiar with

22   the Alticor defendant, how they operate, what their business

23   involves.  Alticor as you may know it is Amway.  It's a multi-

24   level marketing business.  So the way it sells products is

25   extremely different from most of the named defendants, which I

1   think makes it a unique entity which will require ultimately

2   it be tried separately from the other defendants the way it

3   uses its website.  It's very different from, for example, an

4   Amazon or Facebook.

5            So, again, I think there is reasons that are

6   specific to the client for why it should have its business

7   and its accused activities should happen in Michigan as

8   opposed to some of the other retail establishments that are

9   pending in your jurisdiction.

10           THE COURT:  I think you laid that all out, and

11  we will give you a chance for rebuttal on that.  Let me give

12  the plaintiff a chance on that first.

13           MS. MILLER:  Thank you, Your Honor.

14           THE COURT:  Good morning.

15           MR. BOTTS:  Good morning, Your Honor.

16           The motion to transfer, first of all, since

17  there is a burden, undue burden on Alticor, Amway because

18  they're in Michigan.  However, very little of this case

19  involves anything in Michigan.

20           The case is about images posted on a website,

21  whether they were optimized under the patent.  The images

22  themselves are the evidence.  It is quite likely that most

23  of the evidence will just be the electronic files.  The

24  metadata therein should reveal whether they were optimized

25  under the patent.

1          There is no need to -- the organization of the

2     website, how it was operated, how it was maintained, the

3     individuals doing that, although Alticor may decide to raise

4     that, it's our position that that is relatively irrelevant

5     to the case.  Why they did it or who did it, it's really

6     going to come down to the images, and that is going to be

7     electronic whether it's put on a disk in Michigan and sent

8     to counsel or whether it is put on disk here.  It makes no

9     difference.

10          The arguments about the plaintiff, when it was

11     incorporated, where it was incorporated and why, I don't

12     believe that is relevant to this issue.  There shouldn't be

13     a motion to transfer based on the fact that the plaintiff

14     is suing a Delaware corporation in Delaware.

15          The status of the cases in New York was raised.

16     I recently appeared on that case.  There are two defendants

17     there:  Hewlett-Packard and Fujifilm.  Those lawsuits are

18     substantially different than the present because they are

19     based on those two companies' use of the patent in encoding

20     images on cameras and scanners.  This case is about images

21     appearing on a website.

22          I believe the only cases in this District

23     involve website issues and are against Delaware defendants,

24     which is why we're here.  Some corporations are incorporated

25     in Delaware.

1          THE COURT:  You are agree there are no Delaware

2     defendants in this case we're talking about right now, the

3     Alticor case, at the moment?

4          MR. BOTTS:  At the moment.

5          THE COURT:  You are seeking it today.

6          MR. BOTTS:  We had one initially.  We tracked it

7     down.  We believe it to be properly the Amway International

8     defendant now, but that tracks from one of the original

9     named defendants.

10          THE COURT:  What is the status of the New York

11     case?

12          MR. BOTTS:  It's gone through Markman.  That was

13     about Thanksgiving.  Fact discovery has concluded, and

14     expert discovery is about to begin.

15          THE COURT:  Is it the same patent in suit?

16          MR. BOTTS:  There are two patents, this one and

17     another one involving video images.

18          THE COURT:  But the patent in my Alticor case is

19     also involved in the Southern District of New York case?

20          MR. BOTTS:  Correct.

21          THE COURT:  So what about, taking a step out,

22     the general idea that your client should have anticipated

23     and likely did anticipate that its enforcement strategy was

24     going to take it to multiple federal courts across the country?

25          MR. BOTTS:  Well, it could have.  There are

1    probably thousands of defendants that haven't been sued.

2    Now, I'm not involved in every case even in this court, but

3    my understanding is that we're in this court because so many

4    corporations are incorporated in Delaware and this is a

5    proper forum for that, for those cases.

6             The lawsuits originally filed in Texas, I wasn't

7    involved in the filing of those.  My understanding is they

8    were transferred because none of those cases, none of those

9    corporations were incorporated in Texas and didn't have

10   substantial contacts there.  That is why they were transferred

11   to New York and I believe one to the Southern District of

12   California, or Central District.

13            THE COURT:  So your client's already in more

14   than just Delaware and New York.

15            MR. BOTTS:  The others have settled.  The only

16   ones are in New York.

17            THE COURT:  They were transferred to California,

18   but then they settled.

19            MR. BOTTS:  I wasn't involved in that.  I know

20   that there was -- I don't know if it was even docketed in

21   California.  There were arguments on that.  As far as I

22   know, the only live ones were in New York and here, and

23   those again involved entirely different technology.  It's

24   the cameras with the processing boards, the processing

25   chips, and the firmware and the hardware that encoded the

1    JPEG images and stored it on the cameras and on the

2    scanners.

3              Those issues aren't involved in this case at

4    all.  This case is simply the images posted on the websites

5    using the patented method of optimizing the JPEG images so

6    that they resolve quickly.  Well, they come up quickly and

7    they can be changed quickly.  So it's completely different

8    technology.  Well, applied to different technologies, I

9    should say.  It's the same patent applied to different

10   technologies.

11             THE COURT:  Is there anything else?

12             MR. BOTTS:  I just would go back to a couple of

13   points.  The point was made about local interest.  As we

14   briefed, the patents don't contain a local interest factor.

15   Amway's websites were used nationally.  The use of the

16   patent was nationally on the images just about the websites.

17             And, again, the evidence in this case is going

18   to be primarily electronic.  The images used in that in 2007

19   could be downloaded on to a disk, analyzed by both sides

20   experts and argued.  Financial data typically is produced

21   electronically.  Other than that, we're not going after a

22   machine producing widgets or the widgets themselves, just

23   these images that are electronic data.

24             THE COURT:  I think you started by saying you

25   don't think it's relevant where your client is incorporated

1    or headquartered and factors such as that about your client.

2    But doesn't that factor into how much deference the Court

3    should give to your client's choice of Delaware as a forum?

4              MR. BOTTS:  I believe at that time, it was

5    anticipated in the cases would be proper in Texas as far as

6    the hardware cases, and that being the cameras and scanners.

7    The image cases, that it's properly brought here in Delaware

8    against Delaware corporations, I believe.  We would have a

9    hard time bringing them in Texas just for the fact that they

10   had images on their websites.

11             THE COURT:  But do you agree that it is relevant

12   where your client is incorporated and headquartered in

13   terms of deciding how much deference to give to your choice

14   of forum?

15             MR. BOTTS:  It is relevant but a small factor.

16   I apologize for saying irrelevant.

17             THE COURT:  I think the strongest reason for

18   keeping your case here is that I do have whatever, 30 other

19   related cases, but you're saying there may be more suits,

20   you said maybe a thousand defendants out there potentially.

21   Can I have any confidence that I'm really accomplishing any

22   reduction of burden on the overall judiciary if I keep this

23   one case here?

24             MR. BOTTS:  That was in response to the question

25   about whether they anticipated going nationally.  What I

1    meant to convey is that there were potential thousands of

2    cases.  Every website virtually in 2007 was using this JPEG

3    optimization, and those cases could have been filed all

4    over.  It would have involved tracking down thousands of

5    websites.

6              Princeton Digital identified a number of them,

7    approximately 50 that were filed here, including these

8    cases, because they were, as I understand it, again I'm not

9    involved in all of them, the Delaware-based corporations.

10   But there are no more suits to be filed in time.  They have

11   to be filed within the six-year window in order to get the

12   damages.  We're leaving thousands of defendants out there

13   that we just couldn't get to.

14             THE COURT:  So you are representing that

15   Princeton Digital is not going to be bringing any more of

16   these website-based patent litigation lawsuits based on the

17   patent in suit in front of me in any other court?

18             MR. BOTTS:  No, I don't believe they can.  It's

19   six years since 2007, it has expired, and I don't think it's

20   even possible at this point.

21             THE COURT:  Is there anything else?

22             MR. BOTTS:  Nothing, Your Honor.

23             THE COURT:  Okay.  Thank you.  Let me hear

24   rebuttal.

25             MS. MILLER:  I'd like to make three quick

1    points, Your Honor.  On the issue of the dispute being

2    images posted on the website, the posting of that activity

3    occurs in Ada, Michigan.

4           On the issue of the defendants being Delaware

5    entities, two of the defendants, the operating entities for

6    which we agree are proper parties are operating entities

7    that are not Delaware corporations.  As I explained, none

8    of the defendants are headquartered here in Delaware.  The

9    operating companies are headquartered in Michigan.  One is a

10   Michigan corporation, one is a Virginia corporation.

11          Finally, on the burden of defendant.  While it

12   is still defendant's burden, I think we have met that.  And

13   also, as the Court has recognized in the *Mekiki* and the

14   *Gielata* cases, that burden is lessened when plaintiff is not

15   litigating in its home turf.

16          THE COURT:  What about the representation that

17   the discovery is likely to be very limited, pretty much to

18   website images and metadata associated with it?

19          MS. MILLER:  I don't know exactly plaintiff's

20   plan, but I will take that representation it still requires

21   gathering of the data, deposing the witnesses.  Many of

22   them are former employees, and all of that activity occurred

23   in Michigan.  It would be substantially.  And, likewise,

24   because it is code, we would expect that the code would be

25   maintained in Michigan and reviewed in Michigan in any

1    event.

2              THE COURT:  Right.  But --

3              MS. MILLER:  It's not a matter of putting it on

4    a disk and sending it.

5              THE COURT:  All of that routinely happens in

6    other districts for cases that are ultimately tried here.

7    Is there anything different about your situation?

8              MS. MILLER:  Again, I think with respect to the

9    data, no, other than the fact that it is located in Michigan.

10             With respect to the other affirmative defenses

11   regarding our client, the location of the evidence, the

12   location of the witnesses, and the location of the operative

13   facts, all of those demonstrate that it would be much more

14   convenient for our client to be litigating in Michigan.

15             THE COURT:  Okay.  Thank you.

16             MS. MILLER:  Thank you.

17             THE COURT:  I think by agreement we're moving on

18   to the motion to amend in this case; is that correct?

19             MR. BOTTS:  Yes, sir.

20             THE COURT:  So we'll hear from plaintiff on that.

21             MR. BOTTS:  I believe most of the facts were

22   hashed out just a few minutes ago.  Primarily when we filed

23   originally, we thought we had the right people.  We ran into

24   essentially a corporate stew of names, and doing business

25   as, and foreign corporations in a number of instances, and I

1  would cite Your Honor in particular to the briefing where

2  we go through, it's a very confusing list of names and where

3  we go.

4       Ultimately, I think we arrived at Amway

5  International as the proper Delaware corporation, a

6  continuance of the proper party who was a proper party and

7  responsible for the images in 2007.  That entity has been

8  characterized by Alticor as a mere holding company.  That

9  information would be particularly known to Alticor and not

10  to ourselves.

11       If there is an issue on whether it is a proper

12  party on that basis, Princeton Digital would ask for reason-

13  able limited discovery into Amway International's status,

14  whether it's a holding company or whether it's an actual

15  continuation of the active corporation that we believe it is.

16       THE COURT:  If it is just a holding company, you

17  agree it is not a proper party here?

18       MR. BOTTS:  No, I don't know what their

19  definition of a holding company is.  They seem to think that

20  it is fatal to the case.  I don't know what the terms are,

21  I don't know what it holds, what its present status is.  I

22  believe that it's the successor in liability -- one of the

23  successors in liability to the infringement in 2007 based

24  on just the paper trail that I can find in the corporate

25  structure.

1          THE COURT:  What kind of limited discovery would

2     you be looking for?

3          MR. BOTTS:  In the name changes, any agreements

4     relating to the name changes, assignments of liability,

5     stock transfers.  I don't know if there are any.  We found

6     that these Amway corporations exchange names back and forth

7     over several states frequently and confusingly, using the

8     same name in multiple places, similar names as a doing

9     business as in different places while it relates to another

10    company with a similar name to other things.  It's very

11    confusing.  So we need a nice, clean paper trail to establish

12    what in fact Amway International is.

13          THE COURT:  Is there anything else?

14          MR. BOTTS:  Nothing, Your Honor.

15          THE COURT:  All right.  Ms. Miller.

16          MS. MILLER:  Thank you, Your Honor.  On the

17    motion to amend, there is two aspects of it to which we

18    have objected.  One is naming Amway International, Inc., and

19    the other is naming the Alticor.com website, both of which

20    because we feel it has just come too late given the fact

21    that this case in particular is about three or five months

22    worth of damages.

23          On the issue of naming Amway International Inc.,

24    we feel that it is unnecessary at this point because Alticor

25    Inc., the parent of Amway International, is an operating

1    company.  It has answered the case.  It will provide the

2    discovery that is necessary as plaintiff has described it

3    today.  There is no need to bring in Amway International

4    which, as the declarations have indicated, it is primarily a

5    holding company and which it is primarily responsible for

6    international operation of Amway.

7              THE COURT:  Primarily a holding company but not

8    entirely a holding company?

9              MS. MILLER:  That is correct, Your Honor.

10             This case involves U.S. activities.  Quixtar

11   is the U.S., or was in 2007, the U.S. operating arm for

12   Alticor.  So to the extent there are issues on what was

13   being displayed or used to sell product in the United

14   States, the real website is Quixtar.

15             The Amway website, the Alticor website, to the

16   extent they are even brought into this case ultimately, I

17   think we probably need just because as I said, there has

18   been a number of website changes over the years.  But there

19   is no sales operation in 2007 on either of those websites.

20             The fact that the name changes have occurred

21   over time, it is emblematic of the issue of waiting until

22   the 11th hour to sue a company on activities that occurred

23   many, many years ago.  But plaintiff has yet to identify a

24   compelling need to bring in Amway International.  It's not

25   the one that is in position of, or sole possession of any of

1    the information.  And there is no allegation against Amway

2    International that has not been asserted against Quixtar or

3    Alticor Inc.

4              It is a very bare bones complaint.  It merely

5    says these entities are responsible for the website.  It

6    doesn't distinguish between websites.  And for plaintiff's

7    counsel to suggest they now need limited discovery after

8    briefing has been completed, I think it is just another way

9    to attempt to keep Amway International in the case in order

10   to try to hold on to jurisdiction in the Delaware court.

11             THE COURT:  Let's assume for the sake of argument

12   that is what they're trying to do.  Is there something wrong

13   with that?

14             MS. MILLER:  Well, I think it is unnecessary

15   because as we explained in the motion to transfer, even if

16   Amway International is in the case, the case should be

17   transferred.  There has been no demonstration on the record

18   that Amway International has done any activity in Delaware

19   relevant to any of the proposed or named websites.

20             THE COURT:  What is the relationship between

21   Alticor Inc. and Amway International Inc.?

22             MS. MILLER:  So Alticor Inc. is a parent of

23   Amway International.  It is I believe a direct parent, but

24   I can't -- it may be a grandparent, but it's the operating

25   entity.

1    THE COURT:  All right.

2    MS. MILLER:  Then with respect to the Alticor

3    Inc., naming of that website, we think it simply comes

4    too late.  The plaintiff, as you know, had years to file a

5    lawsuit against the defendants.  It named specifically

6    Amway.com and Quixtar.com.  It waited until I think it was

7    the end of September to add the Alticor website.  We're

8    now talking about maybe two months worth of damages.  The

9    nominal value, if any, that that provides certainly is

10   outweighed by the amount of discovery that would go into

11   tracking down the data associated with the Alticor website

12   for that two-month window of time.

13   THE COURT:  Now, you say they added them, but

14   the way they pled in the first or second complaint actually

15   was not exhaustive and it did name a couple websites but it

16   didn't say these are the only ones we're alleging infringe.

17   MS. MILLER:  Your Honor, I would disagree with

18   plaintiff's characterization of that in their brief.  The

19   *Twombly* standards would certainly require it to identify the

20   JPEG images that are accused.  To simply say encoded JPEG

21   images are accused would not have been sufficient because the

22   patent isn't directed to all JPEG encoded images.

23   In fact, it identified specific JPEG encoded

24   images, those on the two websites.  To now bring in JPEG

25   encoded images on yet a third website or to assume that the

1  original pleading would have necessarily encompassed

2  Alticor.com I think is contrary to the pleadings requirements

3  of *Twombly*.  So that is in fact why plaintiff had to amend

4  the complaint to add Alticor.com.

5        THE COURT:  With respect to adding Quixtar as

6  a defendant, that portion of the motion to amend is not

7  opposed.

8        MS. MILLER:  We don't oppose that.  That's

9  correct.

10       THE COURT:  I heard what you said about I think

11 even the request for discovery is untimely in the sense you

12 already briefed it, you put in a declaration.  Would it be

13 unduly prejudicial or in any way improper from your perspective

14 or unwise even for me to say let's take very limited discovery,

15 let's let plaintiff figure out who Amway International Inc. is.

16 And because I think that may be a pertinent factor on the

17 transfer analysis, let's revisit all of this a couple weeks or

18 not too far down the road after they get the limited discovery

19 they want and then reevaluate.

20       What would be your perspective on that?

21       MS. MILLER:  My perspective would be that, again,

22 it is an unnecessary activity.  The discovery that they would

23 need would be discovery happening about Alticor -- Amway

24 International back in 2007.  That is certainly information

25 that has been out there and available for years.  This is a

1    case that needs to be narrowed and its focus narrowed.  We're

2    talking about a very small window of time here on alleged

3    infringement.  And this is emblematic of what has been

4    occurring in this case which is we're trying to narrow the

5    focus down, and the plaintiff continues to try to broaden

6    the focus in order to focus the defendants to settling for

7    litigation costs.  And we feel we have a license defense, a

8    laches defense.  Those are being ignored.  Instead, the

9    activities in court are propounding the cost of defense.

10            We have two operating companies that are assuming

11   liability for the accused websites:  Alticor Inc. and Quixtar

12   Inc.  There is no need to add Amway International, which

13   really is focused outside of the U.S., for its activities.  To

14   bring them in just to compound discovery in such a narrowly

15   focused case sends the wrong message and does burden the Court

16   and our clients unnecessarily.

17            THE COURT:  Okay.

18            MS. MILLER:  Thank you.

19            THE COURT:  Thank you very much.  Is there any

20   rebuttal on the amendment?

21            MR. BOTTS:  Very quickly, Your Honor.

22            The Alticor.com addition again, as briefed, it

23   is PDIC's position it is just adding specificity to the

24   original allegation that the defendants' websites were the

25   location of the JPEG locations.  I don't believe there is an

 1    obligation of the plaintiff to identify specific JPEG images

 2    on those websites at this point, in particular, since those

 3    images are not available to it.  They would be exclusively

 4    in the record of the defendants.

 5            I guess I would just stand on what Your Honor

 6    I'm sure knows well.  In the case of amendment, it's leave

 7    freely granted.  At this point, we're doing our best to

 8    identify the proper parties and move forward.

 9            THE COURT:  Is there any necessity though to

10    adding Amway International Inc.?

11            MR. BOTTS:  They may be the key operating

12    function.  They appear to be the one operating the websites

13    at the time.  I don't want to just toss them out.

14            THE COURT:  Yes.  On what basis do you say that

15    that would be?

16            MR. BOTTS:  By tracking down the names.  Their

17    name appeared on the websites.  And then by tracking it

18    through from Amway Corp. to Amway Corporation, Amway

19    Corporation Delaware, all the way through, we get to Amway

20    International, still a Delaware corporation.

21            THE COURT:  Okay.  Thank you.  We're moving on

22    to the other case then; is that correct?

23            MR. CIARDULLO:  Yes.

24            THE COURT:  All right.

25            MR. CIARDULLO:  Your Honor, on procedure here,

1   I'm not sure what party you would like to hear from first.

2   We filed a motion to dismiss, they filed a motion to amend.

3            THE COURT:  Right.  Have you conferred with

4   Mr. Botts on that?

5            MR. CIARDULLO:  Do you have any opinion on that?

6            MR. BOTTS:  I have no preference.

7            THE COURT:  We have heard from Mr. Botts, and

8   we'll hear more from him, so why don't we give you a chance.

9            MR. CIARDULLO:  Sure.  Okay.

10           THE COURT:  Good morning.

11           MR. CIARDULLO:  My name is Jean-Paul Ciardullo

12   on behalf of United Online.

13           So to quickly recap the procedure here.  The

14   original complaint that was filed was against United Online,

15   my client, and FTD, and we filed a motion to dismiss.  Both

16   defendants did.  They amended their complaint.  FTD has

17   responded, answered.  United Online filed a motion to

18   dismiss the first amended complaint; and in response to

19   that motion to dismiss, plaintiff put in a motion to amend

20   attaching a second amended complaint, which we then opposed,

21   and they replied.  So that's the sort of sequence of

22   briefing.

23           Just a little bit of background on who the

24   defendants are.  My client United Online is a holding

25   company that owns several different Internet companies.

1    That's their business.  So that one of the companies they

2    own, for example, is Classmates.com, which is a social

3    networking website.  They have another website that is

4    called MyPoints that has some sort of point redemption

5    services.  And FTD is an on-line floral company, kind of

6    like a 1-800-Flowers.

7            What happened is United Online had acquired FTD

8    back in 2008 as a wholly owned subsidiary to add to this

9    collection.  And the current status actually is just this

10   past November, United Online spun them back off.  So now

11   they're a separate company entirely.

12           So the 30,000 foot image we have of this case is

13   why is United Online still involved in this?  The acts of

14   infringement that are alleged occurred before United Online.

15   It's against FTD and the floral website.

16           The complaint, the second amended complaint

17   states expressly that United Online is not being accused

18   of infringement.  This is all just based on the successor

19   liability theory.  But if we're in a situation where the

20   acts of infringement they're alleged to occur happened

21   before United Online even acquired them originally and now

22   FTD is not even owned by United Online anymore, we're sort

23   of left wondering why is it we're still even involved in

24   this case.  So that is sort of the 30,000 foot image.

25           Now, just as to some of the specific issues.

1    I'm actually somewhat new to the case, and I was doing some

2    of my own research on legal standards here.  So as I was

3    saying, the theory that they're trying to keep United Online

4    in the case with is successor liability.  And there is a

5    standard that is articulated for that.  In fact, the factors

6    were enumerated in one of your own cases.  That is the

7    *Marnavi* case, 900 F.Supp. 2nd 377, and it lists some of

8    the factors by which you would find potentially a de facto

9    merger, which is one of their successor liability theories,

10   and that the factors that are listed there are that:  One

11   corporation transfers all its assets to another.  Payments

12   made in stock.  And the transferee, the one who buys, in

13   this case United Online, would agree to assume all the debts

14   and liabilities.

15           Now, I want to take a step back from that because

16   I think if you think about why you apply the successor

17   liability theories, I don't think it makes sense in this case.

18   And I'm not a corporate lawyer, I do patent law, so I had to

19   read up on this a little bit.

20           But my understanding of successor liability is

21   that you apply it when there is a company that owes debts or

22   is liable for something and you can't reach them because

23   they sort of vaporized, they vanished into another company,

24   they created another company and sort of switched names and

25   moved on, and it leaves creditors and other people who have

1    potential actions against them sort of without a remedy or

2    without someone to sue.

3             That is expressly, and by the admission of the

4    amended complaint, not the facts here.  The second amended

5    complaint that was put in states very clearly and acknowledges

6    that FTD, when it was owned by United Online, was a separate

7    subsidiary that continued to exist and operate on its own.

8    These were not merged companies.

9             And something that I think is missing from the

10   test that I just listed, and I think just because that case

11   didn't really have to get into the issues too deeply, is

12   that there is another key element to the de facto merger

13   doctrine that is acknowledged by the Third Circuit and other

14   courts around the country, which is that the company that

15   is the transferor company has to cease to exist, which

16   didn't happen here.

17            And I will cite some cases for you.  There is a

18   Third Circuit case, it's *Berg Chilling v Hull*, 435 F.3d 455.

19   And it states:  "The de facto merger doctrine recognizes

20   that an essential characteristic of a merger is that one

21   corporation survives while the other ceases to exist."

22            So, again, the amended complaint expressly says,

23   it acknowledges that FTD was a wholly-owned subsidiary, a

24   separate company, and Delaware is one of the foremost in

25   recognizing the separate nature of a subsidiary.

1          Another Third Circuit case, *United States v*

2   *General Battery Corp.*, 423 F.3d 294, says that:  "De facto

3   merger exception has four elements under the majority

4   standard."  And it enumerates the same ones that were in the

5   case that I originally spoke about but also says, "one of

6   the elements is that the seller corporation" -- in this case

7   it was FTD -- "ceases its ordinary business, liquidates and

8   dissolves as soon as legally and practicably possible."  That

9   did not happen here and that is not going outside the

10  pleadings.  That is what the pleadings state and acknowledged.

11         Another case for the same proposition, *Walsh, et*

12  *al. v Newark Day Nursery Association*.  This is 1985 Del.

13  Super. LEXIS 1004, enumerates the same standard, that is a

14  Delaware court.  And we have some other case law here that

15  elaborates on this.

16         There is a case, *Nature's Plus Nordic*.  It's

17  2013 U.S. Dist. LEXIS 159157.  That's a Eastern District of

18  New York case (2013).  It says:  "De facto merger occurs

19  when the acquiring corporation has not purchased another

20  corporation merely for purposes of holding it as a

21  subsidiary but rather it is effectively merged with the

22  acquired corporation.

23         Another case, *Best Foods*, 173 F.Supp. 2nd 729.

24  This is a Western District of Michigan 2001 case.  Same

25  kind of facts, exact same facts as United Online, the FTD

1    acquisition.  And this case, as the Supreme Court has

2    emphasized, "The wholly owned subsidiary is assumed to be

3    independent for liability purposes.  The mere fact that the

4    one company purchased the others in exchange for stock is

5    insufficient standing alone to confer liability."

6            Another case, *Marenyi*, 1994 U.S. Dist. LEXIS

7    14190.  And this explained -- this is a Southern District of

8    New York 1994 case, explaining that:  Implied assumption of

9    liability is more likely to be found when there is a real

10   possibility that creditors of the seller had been left

11   without a remedy as a result of a sale.  Essentially where

12   the predecessor corporation has not continued to exist as a

13   viable entity.

14           The whole de facto merger doctrine is not

15   something that is applied lightly or often.  The case law

16   clearly says that the Delaware courts use it only in very

17   limited context.  One of the cases that we cited in our

18   briefing, the *AllState* case, 842 F.Supp. 2nd 1216, goes

19   through sort of some other considerations you might look at,

20   applying Delaware law, that would sort of hint at de facto

21   merger, and it has to do again with were the creditors or

22   stockholders injured by the failure to comply with the

23   governing asset sale?  Basically, was there some sort of

24   an almost kind of a fraud that this company is escaping

25   liability somehow or leaving creditors without a remedy?

1    And that is not the case here because there was a separate

2    subsidiary that was operating on its own.

3                 I just want to move past de facto merger because

4    plaintiff also raised a second theory of successor liability,

5    which is implied assumption of liabilities.  The amended

6    complaint doesn't allege any express assumption of liability

7    and doesn't actually I think use the words "implied assumption

8    of liability" either but they're saying that maybe the facts

9    might suggest that.  But we cited case law in the briefing,

10   the *AllState case*, 842 F.Supp.2d 1216.  And so what happened --

11   let me back up.

12                Where the plaintiff is getting this from is that

13   in our motion to dismiss, our original motion to dismiss, we

14   included a press release about the United Online acquisition

15   of FTD that references the fact that when United Online

16   acquired FTD, they repaid some of its indebtedness.  So the

17   plaintiff sort of seized upon that and says:  Wait a minute.

18   Maybe that gives us the theory we can proceed here.  That

19   maybe they assume the liabilities.

20                So that was not something -- they could have

21   researched that beforehand, before they filed the original

22   complaint.  It is not anything they looked into before they

23   kind of seized upon it and tried to interject that as a

24   theory.

25                But I understand that you have to assume the

1    facts pleaded in the complaint are true, but there is also

2    case law that says that you don't have to invent facts that

3    would make it plausible or sort of go beyond what the

4    pleadings actually say.  I don't think that there is enough

5    in there to support an implied assumption of liability.

6            There is also case law importantly, it talks

7    about the fact that just acquiring -- just voluntarily

8    paying some of the debts of the acquired subsidiary does

9    not create this blanket assumption of all liabilities.  The

10   *AllState* case I mentioned before is one of those.

11           There is another one within this Circuit,

12   District of New Jersey case, 1994.  The *Glynwed* case, 869

13   F.Supp. 265.  "Voluntarily applying certain debts is in no

14   respect a wholesale assumption of liability of the

15   corporation."

16           THE COURT:  I think you are right on the law

17   that just assuming some specified or certain debts and

18   liabilities doesn't lead to as a legal matter that you have

19   assumed all debt and liabilities, but the question I think

20   for today is, is that a plausible reasonable inference from

21   an allegation which I have to take as true?  And I think as

22   a factual matter you are not denying it anyway, that your

23   client did assume some liabilities.  So if I take anything

24   in the light most favorable, draw every reasonable inference

25   for the plaintiff, isn't it plausible that your client

1    actually assumed all liabilities?

2              MR. CIARDULLO:  I think the other thing that is

3    important here is that the assumption of liability doctrine

4    shouldn't swallow the de facto merger doctrine, and there is

5    case law to this effect.  One of the four factors for de

6    facto merger is the assumption of all liabilities.

7              Now, if you could just backdoor it and say,

8    well, if you can show that they assumed all liability and

9    there is successor liability, then you have effectively

10   eviscerated the whole de facto merger.  You don't have to

11   get there.  You have to show one element.  There is case law

12   that talks about that.  Yes, it's that *Glynwed* case that I

13   was just referencing from the District of New Jersey.

14             If this showing established implied assumption

15   of all debts, plaintiffs would never need to show any more

16   than this one element to establish corporate successor

17   liability.  That is not the law.  And it cites the Fletcher

18   Encyclopedia of Law Corporations at Section 7124 for that

19   proposition.

20             So I think just on the law, it is not enough

21   for them to sort of guess that maybe United Online might

22   have assumed the liability.  I think that more needs to be

23   shown here, and that the allegations that are in the second

24   amended complaint just don't get there.

25             Now, as to just a couple of other smaller points.

1    We also argued there had been undue delay here in the

2    amendment.  It sounds like there has been similar issues in

3    this other case.  The facts that would have been necessary

4    to support these pleadings would have been known before the

5    original complaint was filed.  The only reason why the

6    plaintiff thought to even allege these successor liability

7    theories was because we had put in this press release and they

8    kind of seized upon it.

9                THE COURT:  That press release is dated in 2008?

10               MR. CIARDULLO:  Yes.  It's an August 26, 2008

11   press release.

12               THE COURT:  And being a press release, it was

13   public; correct?

14               MR. CIARDULLO:  Yes.  It was put on the docket.

15   It's Docket 18-3.  There is also in the docket for reference

16   at Docket No. 21-1, a copy of the press release announcing

17   the spin-off of FTD.

18               So I guess, just in sum, we're sort of in a

19   position here where we feel like United Online has been

20   prejudiced by having to continually file these motions to

21   dismiss and engage in all this briefing.  The original

22   complaint didn't say anything about successor liability.  We

23   put in this press release that they should have found, they

24   should have researched, and they seized upon the de facto

25   liability theory.  We moved to dismiss again.  And then

1    instead of directly responding, they filed a motion to amend

2    and they have now a second amended complaint that says wait

3    a minute.  Let's add another successor liability theory.

4    We'll throw in the implied assumption of liability.

5              So my client is sort of left jumping through

6    hoops and filing motions to dismiss.  All of this stuff

7    should have been done beforehand.

8              THE COURT:  They say you failed to really

9    articulate any undue prejudice from all of that.  Is there

10   any prejudice to your client other than having to jump

11   through all of those hoops and write the briefs and have

12   them pay you and all that?

13             MR. CIARDULLO:  Your Honor, I think that that

14   sums it up.  And that is grounds that has been recognized in

15   cases, and I think we cited some of them, for dismissal with

16   prejudice where there has been repeated, you know, failures

17   to properly amend.  You know, I think it is only bites at

18   the apple.  And I think that that is something that courts

19   have recognized can be a basis for dismissal with prejudice.

20             Going back to where I began with the 30,000

21   foot picture of this case.  Why are we even here?  We had

22   acquired FTD as it was a separate subsidiary operating on

23   its own and then we spun them off.  The complaint, the

24   second amended complaint expressly says it's not accusing

25   United Online of infringement.  And perhaps echoing a theory

1    that was mentioned earlier, I don't know whether this is

2    perhaps just an effort to sort of strong-arm United Online

3    in an attempt to force a settlement for the cost of

4    litigation because we don't really see a legitimate reason

5    why we would still be in the case.

6              THE COURT:  Okay.  Thank you.  We'll hear from

7    the plaintiff.

8              MR. BOTTS:  The original complaint appeared

9    to have the relevant parties.  We were challenged with

10   superior knowledge of the defendant of their acquisition of

11   FTD.  We looked into that and found there was at least an

12   applied assumption of the liability and an apparent de facto

13   merger of the two parties.  Even though the press release

14   existed in 2008, there was no real reason to put it into the

15   complaint because it didn't appear to be an issue.  Both

16   parties appeared to be --

17             THE COURT:  Were you aware of it before filing

18   suit?

19             MR. BOTTS:  I didn't file the suit.  I don't

20   believe we were aware of it.

21             THE COURT:  In an exercise of reasonable

22   diligence, shouldn't whoever prepared the complaint have

23   been aware of that?

24             MR. BOTTS:  I take that back.  I think that

25   might be the reason why United Online was named.  I'm just

1    guessing now because I wasn't the one who prepared the suit.

2              THE COURT:  Is that relevant to the Court's

3    inquiry?

4              MR. BOTTS:  For due diligence?  No, because I

5    don't -- again, both parties appear to be proper defendants

6    just right from the beginning without having to defend as a

7    de facto merger.  Once that issue was raised, it was

8    rebutted with I believe ample evidence relying on their own

9    press release, a reasonable interpretation of that.  FTD was

10   assumed, appears to be assumed.  We're criticized in not

11   knowing all the evidence filed in the complaint.  We don't

12   know all of the evidence standing here today.  They have yet

13   to produce the acquisition documents that outlined what the

14   liabilities were that United Online assumed for FTD.

15             Again, we pled it as at least implied assumption

16   of liability.  For all we know, there may be a clause in

17   that acquisition document that says United Online assumes

18   all liability for intellectual property infringement

19   violations, or that it doesn't.  We don't know.  We don't

20   have that document even at this day.

21             THE COURT:  Now, if this doesn't, end of story?

22             MR. BOTTS:  It all depends on the rest of it.

23   What is FTD?  They seem to say they acquired FTD.  They paid

24   a stock transfer.  They paid money for it.  They acquired

25   their liability.  They were giddy about assuming the ever

1    popular website.  And this case is all about the website.

2    The website was what they were after because it drew in so

3    much business.  It drew in so much business because of the

4    JPEG images it was able to generate because they were

5    compressed under the patent.

6              So this website is very crucial to the deal.  It

7    seems to be the point of acquiring the website, and it is

8    at the core of our litigation.  So I don't know what they

9    acquired.  I guess the biggest issue is did FTD continue to

10   be an independent corporation?  Are they the proper party to

11   be sued?  We haven't heard that yet.

12             THE COURT:  Well, you have alleged that they

13   were a subsidiary.

14             MR. BOTTS:  Well, that is the best we can make

15   of it.  Now they're saying they weren't a subsidiary because

16   they have been spun off and now we should go chase the

17   spin-off, as I understand their argument.

18             Although they say we should have known at the

19   time we filed this suit the status of all the corporations,

20   again, as I stand here more, I'm even more confused than

21   when we filed it because we had a corporation that appeared

22   to be a proper party.  Then there was the allegation that it

23   was not a proper party, that it disappeared as far as United

24   Online was concerned.  We proved that United Online assumed

25   the liability or argued based on proof that they assumed the

1    liability under two theories.  They've come in now and say,

2    no, we didn't assume the liability and, in addition, it's

3    somewhere else.  Go chase it somewhere else.

4              We don't know from FTD what are they.  At this

5    point, we still don't know what they are or even the fact

6    they were spun off where they are.  We believe that it is

7    reasonable to argue at this point based on what we know that

8    United Online assumed, either implicitly or expressly,

9    assumed liability based on what we knew about the agreement,

10   and I would think they would have produced the agreement by

11   now, or that it was a de facto merger based on what we know

12   about the merger itself.  From that point on, what FTD,

13   whether it is spun off or not, we believe that United Online

14   assumed the liability for what FTD had done in 2007.

15             Now, if there is an agreement for the spin-off

16   of FTD, where was the liability assigned?  This was after

17   the lawsuit was filed.  In this spin-off, does this

18   assignment of FTD say, yes, we assume liability for

19   intellectual property infringement during the time 2007 as

20   may be alleged by Princeton Digital, or was that liability

21   retained by United Online when it spun off FTD?

22             Again, it's not that we should have known

23   when we filed this lawsuit.  We still don't know now.  As

24   this point, if the issue is really the status of FTD upon

25   acquisition by United Online and upon spin-off by United

1    Online, we would ask for limited reasonable discovery in

2    order to find these very documents that should have answered

3    that question.  And the parties would, of course, be

4    realigned appropriately according to the evidence.  Right

5    now, we're working reasonably on the best evidence we have.

6            THE COURT:  So what would be wrong with

7    alternatively getting rid of United Online and litigating

8    against FTD, and if you find, in the course of that case,

9    FTD raises a defense we don't have this liability, then you

10   would make your showing try to bring United Online back in?

11           MR. BOTTS:  FTD should be here today, and we

12   haven't heard from them.  I'd like to hear from FTD.  If we

13   can find the liability and FTD says, yes, it's us, then I

14   think it's proper for this case to go forward.  If FTD says,

15   no, it's not us, it's United Online, then I think we still

16   have the same issue.  We've got to resolve liability.

17           But in the meantime, I don't think it's

18   appropriate.  I think it's premature at this time to let

19   United Online out with so many issues about their assumption

20   of liability when they acquired FTD and in the face of

21   reasonable facts to establish that it was at least implied

22   assumption of liability and/or de facto merger.

23           THE COURT:  All right.  Is there anything else?

24           MR. BOTTS:  Nothing Your Honor.

25           THE COURT:  Rebuttal.

1        MR. CIARDULLO:  So just to some of the final

2   points being made there.

3        To be clear, FTD has answered and will be

4   defending and litigating this action.  I have to look at

5   FTD's answer again, but I'm told by counsel who checked that

6   it doesn't have any affirmative defense in there that some

7   other party is liable.  There is a party here to be sued,

8   and it always was a separate company and now is a separate

9   company still.  So I don't think that this is really a

10  successor liability situation for the reasons I said before.

11       I think that the approach that Your Honor just

12  suggested of essentially a dismissal without prejudice makes

13  sense.  United Online should not have to incur the expense

14  and effort on top of what it already has to be litigating in

15  this case.  And if facts are developed that somehow show

16  that it should be involved, they could always be added later.

17       But FTD has answered and a defendant.  They are

18  a party here to be sued.  They have the website.  They

19  always had the website.  United Online's involvement in this

20  is really on the fringes.

21       And just to the merits on the motion to amend,

22  the bottom line as I was citing those cases before is that

23  the de facto merger doctrine gets it.  The transferor

24  company has to cease to exist and result in a situation

25  where there is sort of relief can't be obtained against it

1  so you have to go against the transferee company.  But the

2  amended complaint expressly says that you have, it was a

3  separate subsidiary.

4           So I think that just on the merits of that, this

5  does seem to just all go down to a company that may have

6  been a subsidiary for a while and now is separate and always

7  was separate.  So I would respectfully submit that dismissal

8  with prejudice -- without prejudice.  And if the facts were

9  to show, which I don't think that they do, I don't think

10  United Online should be added back in, but we shouldn't have

11  additional expense to continue to litigate this after all

12  the litigation we have had here with all these motions and

13  briefing.

14           THE COURT:  All right.  Thank you.  I'll ask my

15  Delaware counsel, is it true FTD is not here?  Nobody is

16  here for FTD; correct?

17           MS. FARNAN:  Your Honor, we also represent FTD

18  Group Inc.

19           THE COURT:  You do.

20           MS. FARNAN:  And we, on their behalf, filed an

21  answer.  So that is the other defendant.

22           THE COURT:  Okay.

23           MS. FARNAN:  We are appearing today on behalf of

24  United Online referring to the motions.

25           THE COURT:  But are you here on behalf of FTD as

1    well?

2              MS. FARNAN:  Yes, Your Honor.

3              THE COURT:  Are both of you here on behalf of

4    FTD?

5              MR. CIARDULLO:  Yes.

6              THE COURT:  Okay.  Since I heard FTD is not

7    here, I mistakenly thought that FTD is not here.  So is

8    there anything you want to add on behalf of FTD since it was

9    alleged you are not here?

10             MS. FARNAN:  No, Your Honor.  I think what

11   Mr. Ciardullo just said is that since we have answered the

12   complaint, we're not here to defend.

13             THE COURT:  And there has been no assertion of

14   an affirmative defense that FTD is not liable?

15             MS. FARNAN:  Your Honor, I did review the answer

16   as we're sitting here.  I don't see one, and I certainly

17   don't recall that.  I think the notion is the FTD Group is a

18   proper party.

19             THE COURT:  Okay.  Thank you.  Is there anything

20   further you want to add, Mr. Botts?

21             MR. BOTTS:  No.  I would like to clarify.  I

22   didn't know that FTD was being represented; and we are

23   attempting to get this case and the parties correct.  If FTD

24   is coming forward and saying they are responsible, they will

25   stand responsible for the potential liability for patent

1     infringement in 2007, as pled, then I don't believe there is

2     a need for United Online to be in this case.

3                 We would consent to have them dismissed without

4     prejudice, again because we don't know where these documents

5     are going to lead us and I'm afraid of additional defenses

6     being put forward related to the acquisition and then spin-off

7     of FTD just because the evidence is so strong that they were

8     actually involved.  But if I have a good defendant who is

9     going to stand for it, I'm willing to move forward with that

10    clarification.

11                THE COURT:  Ms. Farnan, and you all can think

12    about this for a moment if you want, but are you going as

13    far as Mr. Botts is asking or is there some need to meet and

14    confer on this or have you already said what you think he is

15    asking for?  This is to either of you.

16                MR. CIARDULLO:  Your Honor, I believe that the

17    strategy of the motion to dismiss without prejudice, FTD

18    answering and standing to defend is entirely appropriate.

19                THE COURT:  All right.  So is there anything you

20    heard from Mr. Botts saying what he needs that you disagree

21    with?

22                MR. CIARDULLO:  I don't think so, no.

23                THE COURT:  All right.  Mr. Botts, are you

24    satisfied with that?

25                MR. BOTTS:  Yes, Your Honor.

```
 1              THE COURT:  Okay.  Well, we'll take a short

 2    recess, and I'll come back and give you my rulings on the

 3    motions.

 4              (Brief recess taken.)

 5              *     *     *

 6              (Proceedings reconvened after recess.)

 7              THE COURT:  Have a seat.

 8         We're ready to rule on the pending motions in

 9    the two cases.  So I'll do it in the reverse order of how

10    the cases were argued because it seemed to me that in the

11    second case, by the time we were done with the argument,

12    there really was nothing to argue about and that things are

13    basically agreed.

14              To put that into specific terms, in the matter

15    versus FTD and United Online, which is our 13-518, there is

16    actually three pending motions.

17              First, we have defendants' motion to dismiss the

18    original complaint.  That's our D.I. No. 8.

19              That motion is denied as moot in light of the

20    subsequent filing of the amended complaint by the plaintiff.

21              Next, we have pending defendant United Online's

22    motion to dismiss that amended complaint.  That is D.I. 15.

23              I'm going to grant that motion, meaning that

24    United Online is dismissed, but this dismissal is without

25    prejudice to the plaintiff subsequently requesting to add
```

1    United Online back should the plaintiff develop evidence

2    that any liability for the alleged infringement is with

3    United Online and not with the FTD defendant as the FTD

4    defendant remains in the case, in fact has answered the

5    complaint and has represented today that if there is

6    liability for the alleged infringement, it rests with the

7    FTD entity.  Then,

8              Finally, in 13-518, there is plaintiff's motion

9    to amend, D.I. 18.

10             That is denied as moot in light of what the

11   parties appear to have agreed to, in any event what the

12   Court has just ordered, with respect to United Online

13   status.  That is specifically dismissed but pursuant to the

14   terms already explained.

15             Before I move on to the other case, are there

16   any questions about what the rulings are in the FTD, United

17   Online matter?  First, the defendant.

18             MR. CIARDULLO:  No, Your Honor.

19             THE COURT:  Okay.  And Mr. Botts.

20             MR. BOTTS:  I would just ask, Your Honor, would

21   you prefer plaintiff to submit a corrected complaint with

22   United Online?

23             THE COURT:  I think it would be helpful for the

24   record to have a new filing.  Is there any opposition to that?

25             MR. CIARDULLO:  I'm just trying to think.  I

1    suppose we would like to see a copy of it first.

2              THE COURT:  All right.  Well, you all work

3    together on that.  If you find you have a dispute on it,

4    then let me know and I'll resolve it for you.  We're not

5    trying to increase or deteriorate anybody's rights.  We just

6    want to have a nice clean record as to what is in the case

7    and what isn't.  If you find you have any trouble with that,

8    let me know.

9              MR. BOTTS:  (Nodding yes.)

10             THE COURT:  All right.  So then turning back to

11   where we already started, in the matter Princeton Digital

12   versus Alticor, this is 13-512, we also have three pending

13   motions in that case.  Let me go through them one by one.

14             First, we have defendants' motion to dismiss for

15   improper joinder.  That's back at D.I. 12, still pending.

16             I'm denying that motion has moot as the issues

17   that it raises that are still ripe are teed up in the other

18   pending motions and really in the pending motion to amend.

19             Let me talk a little bit about plaintiff's

20   motion to amend.  That is our D.I. No. 28.  I'm going to

21   grant that to the extent first that it is unopposed and add

22   the Quixtar defendant.

23             I'm also going to grant it to the extent that

24   plaintiff may add the infringement allegations against the

25   website www.alticor.com.  In the Court's view, this is

1    neither a new allegation, nor an untimely, nor unduly

2    prejudicial or, for that matter, futile allegation so I see

3    no reason not to allow the plaintiff to proceed against the

4    Alticor.com website.

5             I agree with the plaintiff that in context, what

6    this is is providing greater specificity and additional notice

7    to the defendant as the prior allegation of infringement was

8    sufficient to allege infringement and would not, itself, be

9    subject to dismissal.  Providing the greater specificity under

10   the circumstances I think is perfectly appropriate, so the

11   motion for leave to amend is granted to that extent.

12            However, with respect to the request to add

13   Amway International Inc. as a defendant, the motion to amend

14   is denied but without prejudice to renew in the Western

15   District of Michigan because I'm going to be transferring

16   the case there.

17            Why do I deny it at this point?  Well, at this

18   point, in front of me, the plaintiff has shown no reason to

19   add this defendant, Amway International Inc., as a defendant.

20   The defendant represents and has provided some evidence that

21   Amway International Inc. is primarily a holding company and

22   is a child or grandchild of the operating defendant which is

23   the parent or grandparent of Alticor -- that is, Alticor

24   Inc. is the parent or grandparent.

25            So I see no reason to add Amway International

1  Inc. at this point, and I'm just not persuaded at this time

2  under the circumstances that I should grant the alternative

3  request of allowing further discovery, again, as I am going

4  to be transferring this case to the Western District of

5  Michigan, and this battle over whether Amway International

6  Inc. should be added can be fought out there.

7           That takes me finally to defendants' motion to

8  transfer, D.I. 21, which I indicated is granted.

9           There is really only one reason in my view to

10  even think about keeping this case here in the District of

11  Delaware, and that is because there are 32 other related

12  cases brought by the plaintiff that are pending not just in

13  this district but in front of me.

14           Having considered that factor and given it a

15  lot of thought, in light of all of the private and public

16  interests, including those set out in the *Jumara* decision,

17  but I'm not limited to those, and recognizing that the

18  burden is on the defendant to show that the overall mix of

19  factors favors transfer, I conclude that the defendant has

20  met that burden because, again, the only reason to keep the

21  case here is that I will have to deal with, in some respect,

22  these other 32 related cases; but at this point, I have not

23  beep required to do anything in those cases that has required

24  me to learn the technology to this point.

25           In this case, the period of infringement is a very

1   small period.  It is a historical period, not ongoing, back in

2   2007, approximately 8 months.  In this case, notably, Delaware

3   is not the home turf for the plaintiff, plaintiff is not a

4   Delaware entity, and I have no Delaware entities on the

5   defendants' side at this point in this case.

6           So the existence of the many related cases here

7   in this District does provide a legitimate and rational

8   reason to keep this case, No. 33, here in Delaware as well.

9   Overall, it's just not enough of a reason given all the

10  other factors to keep the case here.  It's not a decision

11  that under the circumstances is entitled to great deference

12  or great weight.  Every other one of the factors either

13  favors transfer or is neutral.

14          So when I weigh all that together, with

15  apologies perhaps to a Judge in the Western District of

16  Michigan who may be proceeding and learning this technology

17  just as I am, I think that is the conclusion the law compels

18  me to make.

19          I should add to that the nature of the plaintiff

20  as essentially existing to assert patents, I think it is fair

21  they would have contemplated that they couldn't necessarily

22  sue everybody and keep all those cases in one District.

23  Some cases that are at least somewhat related are pending

24  in at least one other court in New York.  Those cases were

25  originally I am told filed in Texas.  They may have in part

1    been transferred to California.

2                So while my decision today may marginally

3    increase the burden on the federal judiciary overall and, if

4    so, that is regrettable, I do think that is the only thing

5    that would cause me to think about keeping this case here.

6    And when I weigh it all together, I decided it is not enough

7    to cause me to keep it here recognizing the burden is on the

8    defendant.  I find the defendant has met that burden.

9                So we'll get an order out that memorializes

10   those rulings.  But are there any questions on the Alticor

11   case from defendants?

12               MS. MILLER:  No, Your Honor.  Thank you.

13               THE COURT:  From plaintiff?

14               MR. BOTTS:  No, Your Honor.

15               THE COURT:  Is there anything else while we're

16   here?  No?

17               MS. MILLER:  No, Your Honor.

18               MR. CIARDULLO:  No, Your Honor.

19               THE COURT:  All right.  Thank you all very much.

20               (Hearing ends at 11:27 a.m.)

21

22        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.
23

24                         /s/ Brian P. Gaffigan
                           Official Court Reporter
25                          U.S. District Court